IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **OLEKSANDER SAVOSTIANOV**<br>78 Granada Avenue<br>Long Beach, CA 90803,<br><br>    **Plaintiff,**<br><br>    v.<br><br>**FEDERAL ADVOCATES, INC.**<br>1666 K Street, NW Suite 1100<br>Washington, DC 20006,<br><br>**SERVE:**<br>**LEGALINC CORPORATE SERVICES INC.**<br>1325 G Street, NW Suite 500<br>Washington, DC 20005.<br><br>    **and**<br><br>**MICHAEL J. ESPOSITO**<br>20607 Quarterpath Trace Circle<br>Sterling, VA 20165,<br><br>    **Defendants.** | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) **Civil Action No.**<br>)<br>)<br>)<br>)<br>) **JURY TRIAL DEMANDED**<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**COMPLAINT**

COMES NOW Plaintiff Oleksander Savostianov, by counsel, and, pursuant to Rule 8(a) of the Federal Rules of Civil Procedure, brings this suit against Defendants Federal Advocates, Inc. ("Federal Advocates") and Michael Espositio ("Esposito") (together the "Defendants") for their failure to pay Mr. Savostianov's earned wages in breach of the Parties' employment contract and in violation of applicable law. Mr. Savostianov states as follows for his Complaint against Defendants:

## NATURE OF ACTION

1. This action arises from Defendants' knowing and unjustified refusal to pay Mr. Savostianov's earned wages, including commissions, benefits, and severance, in breach of the Parties' written employment agreement (the "Employment Agreement"), and in violation of the District of Columbia Wage Payment and Collection Law (the "DCWPCL").  Despite Mr. Savostianov's exemplary performance for Federal Advocates—a now-notorious lobbying firm located in downtown Washington, D.C.—Defendants knowingly underpaid Mr. Savostianov's wages during his employment, and subsequently refused to release the value of his accrued leave benefits and severance upon his termination.  Mr. Savostianov commenced this action to recover the value of his earned compensation, and further seeks exemplary damages against both Defendants to deter such predatory conduct in the future.

## PARTIES

2. Mr. Savostianov is a a citizen of the State of California with his primary residence located at 78 Granada Avenue, Long Beach, California 90803.

3. Upon information and belief, Federal Advocates, Inc. is a Virginia corporation with its principal place of business located at 1666 K Street, NW, Suite 1110, Washington, DC 20006.

4. Upon information and belief, Michael Esposito is a citizen of the Commonwealth of Virginia with his primary residence located at 20607 Quarterpath Trace Circle, Sterling, VA 20165.

## JURISDICTION AND VENUE

5. This Court has subject matter jurisdiction over the instant action pursuant to 28 U.S.C. §1332(a) because there is complete diversity between the Parties and Mr. Savostianov seeks more than $75,000 in monetary damages.

6. Venue is appropriate in this Court pursuant to 28 U.S.C. §1391 because Mr. Savostianov's claims arise from Defendants' operations within the District of Columbia.

7. This Court has general personal jurisdiction over Federal Advocates because the company is a citizen of the District of Columbia and carries out all operations from within this jurisdiction. Moreover, Mr. Savostianov's claims arise from his employment contract with Federal Advocates, which—at the time such contract was in effect—operated from the District of Columbia.

8. This Court has specific personal jurisdiction over Esposito because he regularly transacts business within this jurisdiction, including serving as President and CEO of Federal Advocates, which is headquartered in the District of Columbia.

## FACTS

### The Employment Agreement

9. In May of 2017, Mr. Savostianov, an experienced government relations professional, entered negotiations with Defendant Esposito regarding prospective employment with Federal Advocates, a consulting and lobbying firm representing the interests of both domestic and international clients before the federal government.

10. Defendants targeted Mr. Savostianov for employment due to his established business relationships with private and government entities in Eastern Europe, a prospective client base Defendants sought to solicit for the provision of consulting and lobbying services.

11. On May 21, 2017, Mr. Savostianov accepted employment with Federal Advocates as a Director of Government and International Affairs.

12. As a Director of Government and International Affairs, Mr. Savostianov's primary employment duty concerned the solicitation of new client business on behalf of Federal Advocates.

13. The terms of Mr. Savostianov's employment with Federal Advocates were memorialized in the Employment Agreement.

14. Pursuant to the Employment Agreement, Federal Advocates compensated Mr. Savostianov with an initial base salary of $81,000.00, which was subject to regular review and adjustment.

15. Additionally, to incentivize Mr. Savostianov's generation of new client accounts, Federal Advocates agreed to pay Mr. Savostianov a ten percent (10%) commission on all monthly fees received from any clients he secured on behalf of Federal Advocates.

16. When offering Mr. Savostianov employment in May 2017, Defendant Esposito indicated that Federal Advocates typically paid revenue-generating employees a five percent (5%) commission on new client accounts. However, Defendant Esposito explained that Federal Advocates was willing to double this standard commission given the significance of Mr. Savostianov's business contacts.

17. The compensation structure offered by Federal Advocates was material to Mr. Savostianov's decision to accept employment with Federal Advocates.

18. Pursuant to the Employment Agreement, Mr. Savostianov was also eligible for paid time off ("PTO"), and accrued one day of PTO for every month of his employment with Federal Advocates, which was not subject to an accrual or rollover cap.

19. Finally, although Mr. Savostianov's employment with Federal Advocates was at-will, the company agreed to provide him with no less than two-weeks' notice prior to terminating his employment, or payment in lieu of such notice, unless such separation was effectuated for "just cause."

20. Defendant Esposito, as Federal Advocates' President and CEO, was responsible for determining and calculating Mr. Savostianov's compensation, including his earned commissions on monthly client invoices and leave benefits, and ensuring the correct administration of Mr. Savostianov's wages during employment.

21. Additionally, as President and CEO of Federal Advocates, Defendant Esposito directed the firm's activities and operations, including the hiring and termination of all employees of Federal Advocates.

**Federal Advocates' Underpayment of Mr. Savostianov's Wages During his Employment**

22. Following the commencement of his employment in June of 2017, Mr. Savostianov successfully used his extensive business relationships to secure numerous client engagements for Federal Advocates.

23. At all times during his employment with Federal Advocates, Mr. Savostianov supported and promoted the company's business interests and performed his job duties in accordance with the Defendants' reasonable expectations.

24. In recognition of his efforts on behalf of the firm, and pursuant to the Employment Agreement, Federal Advocates increased Mr. Savostianov's base salary in 2018 to $100,000.00.

25. Notwithstanding Mr. Savostianov's demonstrable value to Federal Advocates and generation of well over $1,500,000 in new revenue for the company over the course of his employment,

Defendants persistently failed to promptly pay Mr. Savostianov's earned commissions in accordance with the Employment Agreement, which were required to be paid out as an ongoing monthly bonus following Federal Advocates' receipt of the associated monthly fee from a given client account.

26. On numerous occasions during his employment with Federal Advocates, Mr. Savostianov raised concerns with Defendant Esposito regarding commission underpayments, as well as a lack of transparency regarding the amount of revenue actually received by Federal Advocates in connection with client accounts generated by Mr. Savostianov.

27. Despite confirming Mr. Savostianov's commission calculations, Defendant Esposito responded to his concerns with a litany of excuses to justify Federal Advocates' untimely payment of these wages, varying from issues posed by the shutdown of the federal government in 2019, supposed technical problems involving Federal Advocates' transfer of funds to Mr. Savostianov's personal bank account and international transfers that were "flagged" by the Treasury Department thereby preventing payment of Mr. Savostianov's commission payments.

28. Upon information and belief, to the extent any of Defendant Esposito's justifications for Federal Advocates untimely payment of Mr. Savostianov's wages were true at the time such were expressed, all such issues were resolved during Mr. Savostianov's employment, and Federal Advocates therefore received no less than the respective total revenues for the client accounts generated by Mr. Savostianov, as detailed in this Complaint.

**The NCIA Account**

29. In October 2017, Mr. Savostianov secured the National Cannabis Industry Association ("NCIA") as a client on behalf of Federal Advocates.

30. Based on Mr. Savostianov's efforts, the NCIA agreed to engage Federal Advocates for lobbying services in connection with the legalized cannabis industry and related banking reform.

31. In consideration for lobbying services, NCIA paid monthly fees to Federal Advocates ranging from $12,500 to $25,000, with respect to which Mr. Savostianov was entitled to a 10% commission throughout the NCIA engagement, including any subsequent renewals.

32. Upon information and belief, between October of 2017 and Mr. Savostianov's separation from Federal Advocates in January of 2020, Federal Advocates received no less than $560,000 in revenue in connection with the NCIA account.

33. Accordingly, pursuant to the Employment Agreement, Mr. Savostianov's total commissions earned in connection with the NCIA account amounted to no less than $56,000.

34. Despite paying Mr. Savostianov approximately $2,500 in monthly commissions in connection with the NCIA account through August 2019, Federal Advocates inexplicably ceased paying such wages through the remainder of Mr. Savostianov's employment.

35. Because NCIA's engagement of Federal Advocates continued through at least January of 2020, Federal Advocates underpaid Mr. Savostianov by at least $12,500 in wages arising from the NCIA account.

**The Amatext Accounts**

36. In October of 2017, Mr. Savostianov secured an engagement on Federal Advocates' behalf with Amatex Capital ("Amatex"), a private equity firm registered in Cyprus, concerning the promotion of domestic partnership opportunities for Amatext within the United States.

37. Pursuant to that engagement, Amatex agreed to pay Federal Advocates a monthly fee of $15,000.00 for an initial 9-month term in consideration for such lobbying and consulting services.

38. Upon information and belief, Federal Advocates received no less than $110,000.00 in revenue in connection with the Amatex account, with respect to which Mr. Savostianov is entitled to a 10% commission.

39. However, despite Mr. Savostianov earning $11,000.00 in related commissions, Federal Advocates remitted only $3,000.00 in incentive compensation in connection with the Amatext account.

40. Accordingly, Mr. Savostianov is owed $8,000.00 in unpaid commissions in connection with the Amatex Capital account.

41. As of the date of this Complaint, however, Federal Advocates has failed to remit any of Mr. Savostianov's earned incentive compensation in connection with the Amatex account.

**The DeVision Account**

42. In February of 2018, Mr. Savostianov, on behalf of Federal Advocates, secured a contract with DeVision Group ("DeVision"), a real estate company based in Kyiv, Ukraine, with which Mr. Savostianov had a prior business relationship.

43. Based on Mr. Savostianov's efforts, DeVision agreed to engage Federal Advocates for an initial six-month term to provide lobbying services in hopes of securing investments from the now-defunct Overseas Private Investment Corporation.

44. DeVision subsequently extended its engagements with Federal Advocates numerous times between August 2018 and January 2020.

45. Pursuant to these engagements, DeVision agreed to pay monthly fees ranging between $20,000.00 and 40,000.00 per month to Federal Advocates for such lobbying services, with respect to which Mr. Savostianov was entitled to a 10% commission throughout the engagement, including any subsequent renewals.

46. Upon information and belief, Federal Advocates received no less than $520,000 in fees in connection with the DeVision account since February of 2018.

47. Accordingly, pursuant to the Employment Agreement, Mr. Savostianov's total commissions earned in connection with the DeVision account amount to no less than $52,000.

48. However, since Mr. Savostianov secured the DeVision account, Federal Advocates has only remitted $12,000 in associated commissions to Mr. Savostianov.

49. Accordingly, Federal Advocates underpaid Mr. Savostianov by at least $40,000 in wages associated with the DeVision client account.

**The Rybalka Account**

50. In February of 2018, Mr. Savostianov, on behalf of Federal Advocates, solicited a longstanding business connection in Ukraine, Mr. Sergei Rybalka, who agreed to enter into a consulting agreement with Federal Advocates for a monthly fee of $10,000.00, with an initial term of twelve months.

51. Upon information and belief, Federal Advocates received no less than $40,000 in connection with the Rybalka account, to which Mr. Savostianov is entitled a 10% commission.

52. Accordingly, Mr. Savostianov earned commission payments in connection with the Rybalka account in an amount no less than $4,000.00.

53. However, during the term of the Rybalka engagement, Federal Advocates only paid Mr. Savostianov a single monthly commission payment of $1,000.00.

54. Accordingly, Federal Advocates continues to owe Mr. Savostianov incentive compensation in connection with the Rybalka account in an amount not less than $3,000.00.

### The S-Group Accounts

55. In March 2018, Mr. Savostianov, on behalf of Federal Advocates, secured a series of consulting agreements with five (5) affiliated entities based in Ukraine - IPG Trading LLC, IPG Crisps Production LLC, IPG Nuts Production LLC, IPG UA LLC, and IPG Household Production LLC, to which the Parties referred collectively as the "S Group."

56. Based on Mr. Savostianov's efforts, the S Group retained Federal Advocates to provide lobbying services related to the importation of commercial products to the United States in exchange for monthly fees ranging from $5,000.00 - $10,000.00 per entity, to which Mr. Savostianov was entitled to a 10% commission.

57. Upon information and belief, between March 2018 and the present day, Federal Advocates received no less than $120,000 in revenue in connection with the S Group accounts.

58. Accordingly, pursuant to the Employment Agreement, Mr. Savostianov's total commissions earned in connection with the S Group accounts amount to no less than $12,000.00.

59. However, and notwithstanding Mr. Savostianov's repeated requests for payment, Federal Advocates failed to remit any incentive compensation earned by Mr. Savostianov in connection the S Group accounts.

### The Collapse of Federal Advocates and
### Defendants' Breach of the Employment Agreement

60. Beginning in the winter of 2019, Federal Advocates received an onslaught of negative publicity due to misrepresentations allegedly made by Defendant Esposito to clients of Federal Advocates and the general public regarding the extent of his connections within, and corresponding influence over, the current presidential administration.

61. Upon information and belief, this negative publicity culminated in President Donald J. Trump publicly denouncing any purported ties between his administration and Defendant Esposito and/or Federal Advocates, as well as a subsequent investigation of Defendant Esposito by the Federal Bureau of Investigations.

62. Upon information and belief, this media scandal involving Defendant Esposito and Federal Advocates significantly injured the company's reputation among prospective clients and continues to threaten the firm's viability in the federal lobbying industry.

63. Mr. Savostianov was not implicated in this scandal and otherwise played no role in the demise of Federal Advocate's reputation.

64. Upon information and belief, the sharp drop in revenue resulting from Defendant Esposito's alleged misrepresentations required Federal Advocates to engage in cost-cutting measures, including terminating a significant portion of its then-employed workforce.

65. On January 28, 2020, Esposito terminated Mr. Savostianov's employment with Federal Advocates.

66. In his January 28, 2020 termination e-mail, Esposito explained that the action had been necessitated by "unanticipated negative media attention," which had forced the firm "to cut back its operations."

67. Federal Advocates did not terminate Mr. Savostianov as a result of any performance deficiency or other "just cause," as would be required to deny payment in lieu of the two-weeks' notice provision set forth in the Employment Agreement.

68. Given Mr. Savostianov's base salary at the time of his termination, two weeks' worth of such wages carry a monetary value of no less than $3,800.00.

69. However, following its termination of Mr. Savostianov on January 28, Federal Advocates only continued to pay his compensation through January 31, 2020, and did not otherwise provide Mr. Savostianov with compensation in lieu of the two-week notice period for which the Employment Agreement provided.

70. When cordially confirming receipt of Esposito's January 28, 2020 termination e-mail, Mr. Savostianov further reminded Esposito of the significant commission payments that remained owing by Federal Advocates.

71. However, despite again receiving notice of Federal Advocates' failure to fully pay Mr. Savostianov's earned incentive compensation since 2017, Defendants have failed to make any further payments of Mr. Savostianov's commissions since the termination of his employment.

72. Federal Advocates further failed to pay Mr. Savostianov the monetary value of certain benefits upon his termination as required by the wage and hour laws of this jurisdiction.

73. At the time of his termination on January 28, 2020, Mr. Savostianov had accrued thirty-two (32) days of earned but unused PTO in accordance with the accrual system set forth in the Employment Agreement.

74. Based upon his base salary at the time of his termination of $100,000.00, Mr. Savostianov's accrued but unused PTO carried a monetary value of $12,278.17.

75. However, despite subsequent demand by Mr. Savostianov, Federal Advocates failed to promptly remit the value of Mr. Savostianov's unused PTO following his separation.

### COUNT I – VIOLATION OF D.C. WAGE PAYMENT AND COLLECTION LAW
**(against both Defendants)**

76. Mr. Savostianov restates and incorporates by reference the allegations contained in Paragraphs 1 – 75 above as if fully set forth herein.

77. The commission model and leave benefits offered by Federal Advocates in the Employment Agreement were material to Mr. Savostianov's decision to accept employment with Federal Advocates in 2017.

78. Mr. Savostianov earned incentive compensation under the terms of the Employment Agreement on each occasion a client whom he successfully solicited on behalf of Federal Advocates remitted an associated monthly payment to the firm.

79. Between the commencement of Mr. Savostianov's employment in June of 2017 and his termination in January of 2020, Mr. Savostianov had earned no less than $100,000.00 in incentive compensation.

80. As such, the incentive compensation earned, and the PTO accrued, by Mr. Savostianov constitute "wages" under D.C. Code § 32–1301(3).

81. At all relevant times, Defendant Esposito served as the CEO and President of Federal Advocates, and assumed responsibility for setting the terms of Mr. Savostianov's compensation at the onset of his employment, as well as ensuring the correct calculation and administration of his wages and benefits through Mr. Savostianov's termination in January of 2020.

82. As such, Defendant Esposito constitutes Mr. Savostianov's "employer," in addition to Federal Advocates, for purposes of the DCWPCL.

83. Despite repeatedly acknowledging Mr. Savostianov's earned commissions during the course of his employment, Defendants failed to remit approximately $75,000.00 in commission payments to Mr. Savostianov.

84. Defendants further failed to pay Mr. Savostianov the monetary value of his accrued but unused PTO promptly following his termination in January 2020.

85. At the time of his termination, such earned but unused PTO carried a monetary value of $12,278.17.

86. In total, Defendants failed to remit no less than $87,000.00 of Mr. Savostianov's earned wages under the DCWPCL.

87. Defendants never disputed Mr. Savostianov's entitlement to these sums during the course of his employment, but instead asserted a litany of excuses for the delay in paying such whenever confronted by Mr. Savostianov regarding these underpayments.

88. Defendants' continued withholding of these earned wages is deliberate and wrongful, as no bona fide dispute regarding Mr. Savostianov's entitlement to such exists.

89. As a result of Defendants' unjustifiable violation of the DCWPCL, Mr. Savostianov is entitled to recover the amount of his unremitted wages in an amount no less than $87,000.00, as well as exemplary damages in addition to these wages in an amount no less than $261,000.00.

### COUNT II - BREACH OF CONTRACT
### (against Federal Advocates, Inc.)

90. Mr. Savostianov restates and incorporates by reference the allegations contained in Paragraphs 1 – 89 above as if fully set forth herein.

91. The Employment Agreement is a valid and enforceable agreement and its terms are binding upon Federal Advocates.

92. Pursuant to the Employment Agreement, Federal Advocates was required to pay Mr. Savostianov a 10% commission on each monthly fee paid by a client that Mr. Savostianov secured for Federal Advocates' benefit.

93. Federal Advocates breached the Employment Agreement by underpaying Mr. Savostianov by no less than $75,000.00 in commission payments during his employment.

94. Pursuant to the Employment Agreement, Federal Advocates was required to provide Mr. Savostianov with two weeks' notice prior to terminating his employment for any reason except just cause, or payment in lieu of such notice.

95. In January of 2020, Federal Advocates terminated Mr. Savostianov without cause and as a result of the tarnishing of the firm's reputation due to alleged misrepresentations made by Defendant Esposito.

96. Federal Advocates only paid Mr. Savostianov three days' worth of his base salary following his termination in the amount of approximately $800.00, instead of two weeks' worth of wages per the Employment Agreement, which carried a monetary value of approximately $3,800.00.

97. As a result of Federal Advocates' above-detailed breaches of the Employment Agreement, Mr. Savostianov has suffered monetary damages in an amount no less than $81,000.00.

**COUNT III - UNJUST ENRICHMENT**
**(against Federal Advocates)**

98. Mr. Savostianov restates and incorporates by reference the allegations contained in Paragraphs 1 – 97 above as if fully set forth herein.

99. Through his exemplary performance of his employment duties, including the engagement of numerous clients on Federal Advocates and the generation of associated revenue, Mr. Savostianov conferred a benefit upon Federal Advocates.

100. Federal Advocates knowingly accepted such benefits by formally engaging the clients secured by Mr. Savostianov and knowingly receiving revenue from such engagements.

101. Federal Advocates failed to compensate Mr. Savostianov in accordance with the Employment Agreement for his efforts.

102. The circumstances underlying Federal Advocates' receipt of such revenue and client engagements would render the firm's retention of such benefits without remitting Mr. Savostianov's earned wages unjust, and would constitute an unwarranted windfall for the company.

103. Equity commands that Federal Advocates fully compensate Mr. Savostianov for his efforts in securing such benefits on behalf of the firm in accordance with the Parties' intentions at the onset of Mr. Savostianov's employment in 2017.

## PRAYER FOR RELIEF

WHEREFORE, Mr. Savostianov respectfully prays that this Court enter judgment in his favor against all Defendants and award the following relief:

1) An award of compensatory damages against both Defendants in consideration of wages wrongfully withheld by Defendants in the amount of at least $90,000.00;

2) An award of exemplary damages against both Defendants pursuant to D.C. Code § 32-1308 in an amount not less than $261,000.00, or treble the amount of earned wages unlawfully withheld by Defendants;

3) An award of the value of the reasonable attorney's fees and costs incurred by Mr. Savostianov in prosecuting this action pursuant to D.C. Code § 32-1308; and

4) Such further relief as this Court deems just and proper.

Dated: June 23, 2020                    Respectfully submitted,

                                                /s/ David M. E. Moon
David M.E. Moon Esq., Bar No. 1047947
LIPP LAW FIRM, PC
4000 Legato Road, Suite 1100
Fairfax, Virginia 22033
Telephone: (703) 896-7704
david@lipplawfirm.com
*Counsel for Plaintiff Oleksander Savostianov*